MARIO ISKANDER (SBN 327025)
HANI BUSHRA (SBN 256790)
THE LAW OFFICES OF HANI S. BUSHRA
16541 Gothard Street # 208
Huntington Beach, California 92647
Telephone: (714) 984-2000
Facsimile: (714) 489-8128
Email:  mario@bushralaw.com

LEE SQUITIERI (*pro hac vice applications forthcoming*)
SQUITIERI & FEARON, LLP
32 East 57th Street
12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: lee@sfclasslaw.com

MOORE KUEHN, (*pro hac vice applications forthcoming*)
MOORE KUEHN, PLLC
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: fmoore@moorekuehn.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BROWN, Derivatively, on behalf of WORKHORSE GROUP INC., <br><br> Plaintiff, <br><br> v. <br><br> DUANE A. HUGHES, STEVE SCHRADER, STEPHEN FLEMING, ROBERT WILLISON, ANTHONY FUREY, RAYMOND J. CHESS, JACQUELINE A. DEDO, PAMELA S. MADER, GERALD B. BUDDE, H. BENJAMIN SAMUELS, HARRY J. DEMOTT, MICHAEL L. CLARK, <br><br> Defendants, <br><br> WORKHORSE GROUP INC., <br><br> Nominal Defendant. | Case no. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

1

Plaintiff David Brown ("Plaintiff"), by and through his undersigned attorneys, derivatively, on behalf of Workhorse Group Inc., brings this derivative action against certain officers and directors of the Company.  Plaintiff alleges that the officers and directors of the Company breached their fiduciary duties to the Company, were unjustly enriched, wasted corporate assets, committed insider selling, and committed violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following upon personal knowledge with respect to himself and his own acts, and as to all other matters upon information and belief, based upon the substantial investigation of his counsel, including, among other things, an analysis of: (i) a review of Securities and Exchange Commission ("SEC") filings by Workhorse Group Inc. (ii) media reports about the Company, (iii) case filings in *Romario St. Clair, Derivatively on Behalf of Workhorse Group Inc., v. Duane A. Hughes et al.*, A-21-833050-B (Nev.) (the "Derivative Proceedings"), (iv) case filings in *John Kinney v. of Workhorse Group Inc., et al.*, 2:21-cv-02207 (C.D. Cal.) and *Sam Farrar v. of Workhorse Group Inc., et al.*, 2:21-cv-02072 (C.D. Cal.) (the "Securities Class Actions"), (v) press releases, (vi) administrative complaints and affidavits, and (vii) other publicly available documents regarding of Workhorse Group Inc.

## **NATURE OF ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of Workhorse Group Inc ("Workhorse" or the "Company"), against certain of its directors' and officers' for violations of state and federal laws that occurred from February 21, 2020 through the present (the "Relevant Period").

2.      Workhorse is an early-stage company focused on the development of electric delivery trucks ad drone systems. The company touted itself as up and coming manufacturing only 1,800 vehicles in 2021 but having hopes to win a contract with the U.S. Postal Service ("USPS") to replace upward of 165,000 postal vehicles over the next 10 years.

3.      The USPS contract stemmed from the USPS Next Generation Delivery Vehicle ("NGDV") project, a competitive multiyear acquisition process for replacing approximately 165,000 package delivery vehicles.

4.      Prior to the USPS contract opportunity, the Company was hemorrhaging money, with a $109 million deficit, a net loss every year since its inception in 2007, negative cash flow of $70.3 million in 2020 and no cogent plan to reverse course in the coming years.

5.      The USPS contract was thought to be worth approximately $6.3 billion, a lifeline for the Company, and a major catalyst for Workhorse stock.

6.      Defendant Steve Schrader, the Company's Chief Financial Officer, stated that "if we were to get the full award or a decent size award, that would be transforming for the [C]ompan[y]."

7.      Defendant Schrader publicly endorsed the Company as a strong candidate to win the USPS contract stating in an interview with Benzinga:

we can save postal services upward of 60% of vehicle costs. Our truck will cost fleets 40 cents a mile compared to the current $1 per mile.

8.      In another Benzinga article, Defendant Schrader was quoted as saying:

What I will say is our all-electric is probably the perfect vehicle for them. When you think about what the Post Office does, 70% of their trucks go about 17 to 18 miles a day and make 700 stops--mailbox, mailbox, mailbox. Ours runs more like a golf cart, so that's really what you need. Right now they get five to six miles per gallon. Ours get more than 40 miles per gallon equivalent.

9.    Workhorse shares had nearly doubled in the early days of 2021 in part on anticipation it would be involved in the final award.

10.    Despite these representations in July 2020 from Workhorse sparking investor confidence, the USPS  awarded the company's competitor, Oshkosh (NYSE:OSK), with the contract.

11.    On this news, securities of Workhorse fell $14.87 per share, or 47%, to close at $16.47 per share in the regular session on February 23, 2021. The price continued to drop in after-hours trading and opened on February 24, 2021 at a price of $14.07 per share, a fall of over 50% from the previous open, damaging investors.

12.    At present, Workhorse trades for approximately $8 per share.

13.    Also following the award, Roth Capital lowered its price target on the shares to $15, from $19, and Oppenheimer downgraded Workhorse to perform from outperform.

14.    Before investors and the public learned of this crushing news, several of the Company's directors and insiders sold off substantial amounts of the company's stock totaling 2,608,894 shares while in possession of material nonpublic information.  For instance, Chief Executive Officer and Director Hughes sold 568,502 shares of Company common stock at artificially inflated prices for proceeds of over $14 million.  Almost all other directors and officers also sold material amounts of stock while in possession of material nonpublic information.

15.    Plaintiff brings this action derivatively to recover the damages suffered by FirstEnergy due to the Defendants breaches of fiduciary duties and to effect changes to the Company's corporate governance practices and internal control procedures.

## VENUE AND JURISDICTION

16.     The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District. In addition, the Securities Class Action is pending in this District.

## THE PARTIES

**Plaintiff**

19.     Plaintiff David C. Brown was a stockholder of Workhorse at all times of the wrongdoing complained of, has continuously been a stockholder since that time, is a current Workhorse stockholder, and will continue to hold his shares until the conclusion of this litigation.

**Nominal Defendant**

20.     Nominal defendant Workhorse is a Nevada corporation with principal executive offices located at 100 Commerce Drive Loveland, Ohio 45140. Workhorse is a technology

company providing sustainable and cost-effective solutions to the commercial transportation sector. As of December 31, 2020, the Company had approximately 130 employees.

**Defendants**

21.     Defendant Duane A. Hughes ("Hughes") is the Chief Executive Officer ("CEO") and a director and has been since February 2019, and President and has been since August 2016. Defendant Hughes was also the Chief Operating Officer from May 2017 to February 2019.Defendant Hughes is named as a defendant in related securities class actions that allege he violated sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"). While in possession of material, nonpublic information concerning Workhorse's true business health, defendant Hughes sold 568,502 shares of his stock for $14,399,122.23 in proceeds.[1] Workhorse paid defendant Hughes the following compensation as an executive:

| Year | Salary | Stock Award | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------------|----------------------------------------|-------|
| 2020 | $475,000 | 475,00 | $384,750 | $1,334,750 |

22.     Defendant Schrader is the CFO and has been since December 2019. Defendant Schrader is named as a defendant in related securities class actions that allege he violated sections 10(b)and 20(a) of the Exchange Act. While in possession of material, nonpublic information concerning Workhorse's true business health, defendant Schrader sold 15,152 shares of his stock for $332,131.84 in proceeds. Workhorse pays defendant Schrader a base salary of $275,000 per year. In 2019, the Company paid defendant Schrader with 84,877 shares of restricted common stock that vest over three years commencing on July 1, 2020. On May 21, 2020, the Company

---

[1] In order to give the Insider Selling Defendants (as defined herein) the benefit of the doubt, plaintiff did not include sales a defendant identified on his or her Form 4 as a Code F transaction in his sales analysis.

granted defendant Schrader another 77,830 shares of restricted common stock, which vest over three years.

23.     Defendant Stephen Fleming ("Fleming") is the Vice President and General Counsel and has been since November 2019. Defendant Fleming was also the outside corporate/securities counsel from 2010 to November 2019. While in possession of material, nonpublic information concerning Workhorse's true business health, defendant Fleming sold 304,796 shares of his stock for $6,614,781.05 in proceeds. Workhorse paid defendant Fleming the following as an executive:

| Year | Salary | Stock Award | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------------|----------------------------------------|-------|
| 2020 | $300,000 | $225,000 | $101,250 | $626,250 |

24.     Defendant Robert Willison ("Willison") is the Chief Operating Officer and has been since February 2019. Defendant Willison was also the Director of Research and Development from July 2016 to June 2018. While in possession of material, nonpublic information concerning Workhorse's true business health, defendant Willison sold 169,920 shares of his stock for $4,825,492.80 in proceeds. Workhorse paid defendant Willison the following as an executive:

| Year | Salary | Stock Award | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------------|----------------------------------------|-------|
| 2020 | $300,000 | $225,000 | $101,250 | $626,250 |

25.     Defendant Anthony Furey ("Furey") is the Vice President of Finance and has been since November 2019. While in possession of material, nonpublic information concerning Workhorse's true business health, defendant Furey sold 201,862 shares of his stock for $4,407,915.04 in proceeds.

26.     Defendant H. Benjamin Samuels ("Samuels") is a Workhorse director and has been
since December 2015. Defendant Samuels is a member of Workhorse's Audit Committee and  has
been  since  at  least  October  2019.  While  in  possession  of  material,  nonpublic  information
concerning Workhorse's true business health, defendant Samuels sold 1,099,994 shares of his stock
for $24,477,884.93 in proceeds.

27.     Defendant Raymond J. Chess ("Chess") is the Chairman of the Board and has been
since December 2015 and a director and has been since October 2013. Defendant Chess was also
a member of Workhorse's Audit Committee from at least October 2019 to November 2020. While
in possession of material, nonpublic information concerning Workhorse's true business health,
defendant Chess sold 68,218 shares of his stock for $1,428,218.48 in proceeds.

28.     Defendant Harry DeMott ("DeMott") is a Workhorse director and has been since
September 2016. While in possession of material, nonpublic information concerning Workhorse's
true  business  health,  defendant  DeMott  sold  112,450  shares  of  his  stock  for  $2,675,904  in
proceeds.

29.     Defendant Gerald B. Budde ("Budde") is a Workhorse director and has been since
December 2015. Defendant Budde is Chair of Workhorse's Audit Committee and a member of that
committee and has been since at least October 2019. While in possession of material, nonpublic
information concerning Workhorse's true business health, defendant Budde sold 60,000 shares of
his stock for $1,195,800 in proceeds.

30.     Defendant Pamela S. Mader ("Mader") is a Workhorse director and has been since
May 2020. While in possession of material, nonpublic information concerning Workhorse's true
business health, defendant Mader sold 8,000 shares of her stock for $240,000 in proceeds.

31.     Defendant Michael L. Clark ("Clark") is a Workhorse director and has been since September 2018. Defendant Clark is a member of Workhorse's Audit Committee and has been since at least October 2019.

32.     Defendant Jacqueline A. Dedo ("Dedo") is a Workhorse director and has been since May 2020. Defendant Dedo is a member of Workhorse's Audit Committee and has been since November 2020.

33.     The defendants identified in ¶¶15-19 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15, 20-26 are referred to herein as the "Director Defendants." The defendants identified in ¶¶20-21, 23, 25-26 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶15-24 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶15-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Workhorse and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Workhorse in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Workhorse and not in furtherance of their personal interest or benefit.

35.     To discharge their duties, the officers and directors of Workhorse were required to

exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Workhorse were required to, among other things:

(a)  conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)  refrain from using the Company's nonpublic information to their own advantage; and

(c)  remain informed as to how Workhorse conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

36.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Workhorse, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

37.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Workhorse, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the

other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Workhorse has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

38.     In addition to these duties, the Audit Committee Defendants, defendants Chess, Budde, Samuels, Dedo, and Clark, owed specific duties to Workhorse to assist the Board in overseeing "the Company's accounting and financial reporting processes...." Moreover the Audit Committee's Charter provides:

**<u>Audited Financial Statements</u>**

6. <u>Review and Discussion</u>. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters about which Statement on Auditing Standards No. 61(Codification of Statements on Auditing Standards, AU §380) requires discussion.

7. Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board that the Company's audited   financial statements be included in the Company's Annual Report on Form 10-K

8. Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

**<u>Review of Other Financial Disclosures</u>**

9. <u>Independent Auditor Review of Interim Financial Statements</u>. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's

review of interim financial information.

**Controls and Procedures**

10. Oversight. The Audit Committee shall coordinate the Board' oversight of the

Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the  CEO and CFO required by Rule 13a-14 of the Exchange Act.

## IMPROPER STATEMENTS

39.    As of 2020, the Company had still never been profitable and one of its most largest customers, UPS, had not ordered additional vehicles since 2018 with no known plans to do so. The USPS selecting Workhorse to build even some substantial amount of the NGDV would be a huge shift for the Company, as acknowledged by Company officers.

40.    The Individual Defendants, when discussing the USPS NGDV project and contrary to representations that they could not discuss the specifics of the USPS's process, advised the Company was well positioned for the USPS contract because of the substantial savings Workhorse vehicles offered.  This substantial savings was a pipe dream though because it would require billions of dollars in additional costs to upgrade the USPS's infrastructure in order to handle a significant amount of electric vehicles. Defendants knew this fact when pretending it could provide this substantial savings to USPS and failed to qualify it.

41.    On July 7, 2020, defendant Schrader gave an interview to the investing website, Benzinga. During the interview, defendant Schrader said the way the Company would differentiate itself was the substantial savings the postal service would reap from using its vehicles. In particular, he stated:

[Benzinga:] How does Workhorse separate itself from the competition?

[Defendant Schrader:] Our trucks don't have a transmission, so we can save postal services upward of 60% of vehicle costs. Our truck will cost fleets 40 cents a mile compared to the current $1 per mile.

42.      Defendant Schrader talked to Benzinga again two weeks later on July 21, 2020. During the interview defendant Schrader highlighted the "last-mile delivery" market as a major long-term opportunity for Workhorse. Defendant Schrader called the "last mile delivery" market an "$18 billion market" and that "[i]n two years, best case, we get the Post Office contract, we also have a lot more orders and we're producing to the tune of maybe 2,000 to 3,000 new vehicles per year in the C-Series[.]"

43.      Further, defendant Schrader provided an "update" on the Company's bid for the NGDV contract, including that "he can't discuss too much about the process at this point, but Workhorse is the only all-electric option[,] and that:

> "What I will say is our all-electric is probably the perfect vehicle for them. When you think about what the Post Office does, 70% of their trucks go about 17 to 18 miles a day and make 700 stops--mailbox, mailbox, mailbox. Ours runs more like a golfcart, so that's really what you need. Right now they get five to six miles per gallon. Ours get more than 40 miles per gallon equivalent," Schrader said.
>
> In addition, he said Workhorse vehicles have half the maintenance costs of the current USPS fleet.
>
> "I think it's a great opportunity for us. Obviously, if we were to get the full award or a decent-sized award, that would be transforming for the company," Schrader said.

44.      On August 6, 2020, defendant Hughes gave an interview on the financial television network, CNBC. During the interview, defendant Hughes claimed that he was unable to speak about the USPS bid other than it "would be a very company-changing experience."

45.      Defendant Schrader made a similar statement during an October 29, 2020 interview with Benzinga, calling the USPS NGDV "transforming" for the Company.

46.      On January 28, 2021, defendant Schrader participated in an interview on a YouTube channel focused on investing in the stock market. During the interview, defendant

Schrader discussed President Joseph R. Biden's recent comment that he wanted to replace the federal vehicle fleet with electric vehicles. The host of the YouTube channel connected President Biden's comments with the USPS contract, though coyly claimed that he knew "we can't speak about the USPS contract, even though that's what the entire comment section is probably asking us about, but I'd just like to get your thoughts on his statements and what it could potentially mean for Workhorse going forward." In response, defendant Schrader stated:

> Yeah, I think the President's announcement was huge, for several reasons, right? It's, one, supportive of the E. V. ("electric vehicle") market. It's, two, all-American, like you said, all-American product buy. And I think he also said a lot about small businesses, and purchasing, whether it be parts or final products, from small businesses, too. So I think that's huge. I think it's meaningful that he did this his fifth day into his presidency, right? He did it quickly; he didn't really wait and so I think that, putting a move on that was very quick too. I think it's also meaningful that, when you think about it, when the government gets behind things, things happen.
>
> And in this case, it's, the government actually is maybe somewhat behind the commercial market. As you well know, customers are already demanding these products, right? Investors are already looking at companies that are making these products, so I think everybody sees that E.V.s are kind of the way of the future going forward, and they see —customers see — the savings opportunities and I think what probably has, the only thing that has been missing, to some extent, is that now you've got the government behind it, from a standpoint of environmental, you know, and just — savings opportunities going forward. So, yeah, having the government push us and the President come out, like I said, five days after his inauguration, is huge.

## THE TRUTH EMERGES

47.    The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on February 23, 2021. On that day, the USPS announced that it awarded the entire multibillion NGDV contract to Oshkosh.

48.    On this news, Workhorse's market capitalization dropped more than 47%, or $14.88 per share, to close at $16.47 per share compared to the previous trading day's closing of $31.34 per share, erasing over $1.8 billion in market capitalization in a single day.

49.    On February 24, 2021, Postmaster General DeJoy testified in front of the House Committee on Oversight and Reform. DeJoy stated during his testimony that the USPS's plan called for 10% of its new trucks to be electric. U.S. Representative Jackie Speier asked why 90% of the USPS's new vehicles were not electric. In response, DeJoy stated, "[w]e don't have the three or four extra billion dollars in our plan right now that it would take to do it."

## REASONS THE STATEMENTS WERE IMPROPER

50.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Company's vehicles would not save the USPS money, as switching to an all-electric fleet would cost billions of dollars;

(b)    the USPS switching to an all-electric fleet was cost prohibitive; and

(c)    as a result of the foregoing, the USPS would not be able to order a meaningful amount of the Company's vehicles, and therefore the USPS NGDV contract was not a transformative event for Workhorse.

## INSIDER SALES BY DEFENDANTS BUDDE, CHESS, DEMOTT, FLEMING, FUREY, HUGHES. MADER. SAMUELS. SCHRADER. AND WILLISON

51.    Rather than providing the market with correct information, the Insider Selling Defendants, defendants Budde, Chess, DeMott, Fleming, Furey, Hughes, Mader, Samuels, Schrader, and Willison, used their knowledge of Workhorse's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Workhorse the Insider Selling Defendants were privy to material, nonpublic information about the Company's true business health. During the brief seven month "Sales Period," from July 7, 2020, to February 23, 2021, the Insider Selling Defendants sold over 2.6

million shares for proceeds of $60.5 million. Though some of the sales were pursuant to 10b5-1 trading plans, the Insider Selling Defendants have not disclosed when those plans were entered into. The sales are suspicious in both amounts and timing, and do not match previous trading practices, and therefore, the reasonable inference is that even the 10b5-l plans were entered into with knowledge that the Company's stock price was inflated due to the false statements detailed herein.

52.     In particular, while in possession of this knowledge, defendant Hughes sold 568,502 shares of his personally held Workhorse stock for proceeds of approximately $14.4 million. Defendant Hughes' sales were timed to maximize profit from Workhorse's then artificially inflated stock price, as his sales began on July 13, 2020, less than a week after the first false statement. Defendant Hughes' sales are suspicious given that his stock sales represented 62% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant Hughes did not sell any stock, nor has he sold any stock since.

**Hughes, Duane A.**
**Current Chief Executive Officer, Director and President**

| Total Shares Before Sales | 397, 598 |
|---|---|
| Shares Sold During Sales Period ("SP") | 568,502 |
| Shares Disposed (Other) During SP | 26,002 |
| Total Share Held During SP | 914,589 |
| Shares Remaining from Sales | 320,085 |
| **Total Proceeds from Sales** | **14,399,122.23** |
| **% of Total Ownership Sold During SP** | **62.16%** |

53.     While in possession of this knowledge, defendant Samuels sold approximately 1.1 million shares of his personally held Workhorse stock for proceeds of $24.4 million. Defendant Samuels' sales were timed to maximize profit from Workhorse's then artificially inflated stock

price, as his sales began in August 2020, during the heart of the false statements. Defendant Samuels' sales are suspicious given that his stock sales represented approximately 51% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant Samuels did not sell any stock and he has not sold any stock since the truth has come out.

**Samuels, H. Benjamin**

**Current Director**

| | |
|---|---:|
| Total Shares Before Sales | 1,719,759 |
| Shares Sold During SP | 1,099,994 |
| Shares Disposed (Other) During SP | 0 |
| Total Share Held During SP | 2,160,084 |
| Shares Remaining from Sales | 1,060,090 |
| **Total Proceeds from Sales** | **$24,477,884.93** |
| **% of Total Ownership Sold During SP** | **50.92%** |

54.     While in possession of this knowledge, defendant Fleming sold 304,796 shares of his personally held Workhorse stock for proceeds of $6.6 million. Defendant Fleming's sales were timed to maximize profit from Workhorse's then artificially inflated stock price, as his sales began on July 13,2020, less than a week after the first false statement and at the same time as defendant Hughes' sales. Defendant Fleming's sales are suspicious given that his stock sales represented 43% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant Fleming did not sell any stock, nor has he sold any since the truth came out.

**Fleming, Stephen**

**Current General Counsel and Vice President**

| | |
|---|---:|
| Total Shares Before Sales | 620,171 |

| | |
|---|---|
| Shares Sold During SP | 304, 796 |
| Shares Disposed (Other) During SP | 44,904 |
| Total Share Held During SP | 704,546 |
| Shares Remaining from Sales | 354,846 |
| **Total Proceeds from Sales** | **$6,614,781.05** |
| **% of Total Ownership Sold During SP** | **43.26%** |

55.     While in possession of this knowledge, defendant Willison sold 169,920 shares of his personally held Workhorse stock for proceeds of $4.8 million. Defendant Willison's sales were timed to maximize profit from Workhorse's then artificially inflated stock price, as his sales began on July 15, 2020, a week after the first false statement, and just a few days after defendant Hughes' sale. Defendant Willison's sales are suspicious given that his stock sales represented approximately 48% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant Willison did not sell any stock, nor has he sold any since the truth came.

**Willison, Robert**

**Current Chief Operations Officer**

| | |
|---|---|
| Total Shares Before Sales | 204,428 |
| Shares Sold During SP | 169, 920 |
| Shares Disposed (Other) During SP | 6,103 |
| Total Share Held During SP | 354,428 |
| Shares Remaining from Sales | 178,405 |
| **Total Proceeds from Sales** | **$4,825,492.80** |
| **% of Total Ownership Sold During SP** | **47.94%** |

56.     While in possession of this knowledge, defendant Furey sold 201,862 shares of his personally held Workhorse stock for proceeds of $4.4 million. Defendant Furey's sales were timed to maximize profit from Workhorse's then artificially inflated stock price, as his sales began on

July 17, 2020, a little over a week after the first false statement and a few days after defendant Hughes began selling his stock. Defendant Furey's sales are suspicious given that his stock sales represented 48% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant Furey did not sell any stock and he has not sold any stock since.

**Furey, Anthony**

**Current Vice President of Finance**

| | |
|---|---|
| Total Shares Before Sales | 414,523 |
| Shares Sold During Sales Period ("SP") | 201,862 |
| Shares Disposed (Other) During SP | 27,534 |
| Total Share Held During SP | 416,523 |
| Shares Remaining from Sales | 187,127 |
| **Total Proceeds from Sales** | **$4,407,915.04** |
| **% of Total Ownership Sold During SP** | **48.46%** |

57.     While in possession of this knowledge, defendant DeMott sold 112,450 shares of his personally held Workhorse stock for proceeds of $2.6 million. Defendant DeMott's sales were timed to maximize profit from Workhorse's then artificially inflated stock price. Defendant DeMott's sales are suspicious given that his stock sales represented 82% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant DeMott did not sell any stock and he has sold only 4,000 shares, for proceeds of less than $67,000, since the truth came out.

**DeMott, Harry**

**Current Director**

| | |
|---|---|
| Total Shares Before Sales | 94,355 |
| Shares Sold During SP | 112,450 |

| | |
|---|---|
| Shares Disposed (Other) During SP | 0 |
| Total Share Held During SP | 136,355 |
| Shares Remaining from Sales | 23,905 |
| **Total Proceeds from Sales** | **$2,675, 904.00** |
| **% of Total Ownership Sold During SP** | **82.47%** |

58.     While in possession of this knowledge, defendant Chess sold 68,218 shares of his personally held Workhorse stock for proceeds of $1.4 million. Defendant Chess' sales were timed to maximize profit from Workhorse's then artificially inflated stock price, as his sales began on July 15, 2020, a week after the first false statement and within a few days of when defendant Hughes began selling his stock. Defendant Chess' sales are suspicious given that his stock sales represented 34% of his holdings as demonstrated by the table below. Notably, in the same amount of time before the start of the Sales Period, defendant Chess did not sell any stock and since the truth was revealed sold only 5,000 shares, for proceeds of approximately $83,000.

**Chess, Raymond J.**

**Current Director**

| | |
|---|---|
| Total Shares Before Sales | 175,704 |
| Shares Sold During  SP | 68,218 |
| Shares Disposed (Other) During SP | 1,096 |
| Total Share Held During SP | 195,794 |
| Shares Remaining from Sales | 126,390 |
| **Total Proceeds from Sales** | **$1,428,218.48** |
| **% of Total Ownership Sold During SP** | **34.86%** |

59.     While in possession of this knowledge, defendant Budde sold 60,000 shares of his personally held Workhorse stock for proceeds of approximately $1.2 million. Defendant Budde's

sales were timed to maximize profit from Workhorse's then artificially inflated stock price.
Defendant Budde's sales are suspicious given that his stock sales represented 21% of his holdings
as demonstrated by the table below. Notably, in the same amount of time before the start of the
Sales Period, defendant Budde did not sell any stock and defendant Budde has not sold any of his
Workhorse stock since the truth was revealed.

**Budde, Gerald B.**

**Current Director**

| | |
|---|---:|
| Total Shares Before Sales | 214,047 |
| Shares Sold During Sales Period ("SP") | 60,000 |
| Shares Disposed (Other) During SP | 0 |
| Total Share Held During SP | 274,047 |
| Shares Remaining from Sales | 214,047 |
| **Total Proceeds from Sales** | **$1,195,800.00** |
| **% of Total Ownership Sold During SP** | **21.89%** |

60.     While in possession of this knowledge, defendant Mader sold 8,000 shares of her
personally held Workhorse stock for proceeds of $240,000. Defendant Mader's sales were timed
to maximize profit from Workhorse's then artificially inflated stock price. Defendant Mader's sales
are suspicious given that her stock sales represented 67% of her holdings as demonstrated by the
table below. Notably, in the same amount of time before the start of the Sales Period, defendant
Mader did not sell any stock, and since the truth was revealed defendant Mader has not sold any
stock.

**Mader, Pamela S.**

**Current Director**

| | |
|---|---:|
| Total Shares Before Sales | 11,939 |
| Shares Sold During Sales Period ("SP") | 8,000 |

| | |
|---|---:|
| Shares Disposed (Other) During SP | 0 |
| Total Share Held During SP | 11,939 |
| Shares Remaining from Sales | 3,939 |
| **Total Proceeds from Sales** | **$240,000.00** |
| **% of Total Ownership Sold During SP** | **67.01%** |

61.     While in possession of this knowledge, defendant Schrader sold 15,152 shares of his personally held Workhorse stock for proceeds of over $332,131.48. Defendant Schrader's sales were timed to maximize profit from Workhorse's then artificially inflated stock price. Notably, in the same amount of time before the start of the Sales Period, defendant Schrader did not sell any stock.

62.     In sum, defendants Budde, Chess, DeMott, Fleming, Furey, Hughes, Mader, Samuels ,Schrader, and Willison sold $60.5 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BUDDE** | 8/31/2020 | 50,000 | $17.72 | $866,000.00 |
| | 1/26/2021 | 10,000 | $30.98 | $309,800.00 |
| | **Total Shares** | **60,000** | **Total Proceeds** | **$195,800.00** |
| | | | | |
| **CHESS** | 7/15/2020 | 27,365 | $16.34 | $447,144.10 |
| | 8/7/2020 | 4,000 | $15.32 | $61,280.00 |
| | 9/15/2020 | 4,000 | $25.41 | $101,640.00 |
| | 10/15/2020 | 4,000 | $22.39 | $89,560.00 |
| | 11/16/2020 | 4,000 | $19.26 | $77,040.00 |
| | 12/18/2020 | 5,000 | $21.05 | $105,250.00 |
| | 1/7/2021 | 10,000 | $24.77 | $247,700.00 |
| | 1/15/2021 | 4,853 | $24.46 | $118,704.38 |
| | 2/16/2021 | 5,000 | $35.98 | $179,900.00 |
| | **Total Shares** | **68,218** | **Total Proceeds** | **$1,428,218.48** |
| | | | | |
| **DEMOTT** | 9/28/2020 | 50,000 | $26.14 | $1,307,000.00 |
| | 12/14/2020 | 62,450 | $21.92 | $1,368,904.00 |
| | **Total Shares** | **112,450** | **Total Proceeds** | **$2,675,904.00** |

| | | | | |
|---|---|---|---|---|
| **FLEMING** | 7/13/2020 | 5,601 | $17.19 | $96,281.19 |
| | 7/13/2020 | 28,390 | $16.54 | $469,570.60 |
| | 7/13/2020 | 6,009 | $15.66 | $94,100.94 |
| | 9/14/2020 | 50,000 | $23.85 | $1,192,500.00 |
| | 10/16/2020 | 50,000 | $23.00 | $1,150,000.00 |
| | 12/14/2020 | 164,796 | $21.92 | $3,612,328.32 |
| | **Total Shares** | **304,796** | **Total Proceeds** | **$6,614,781.05** |
| | | | | |
| **FUREY** | 7/17/2020 | 30,000 | $16.34 | $490,200.00 |
| | 9/14/2020 | 50,000 | $23.85 | $1,192,500.00 |
| | 10/16/2020 | 50,000 | $23.00 | $1,150,00.00 |
| | 12/14/2020 | 71,862 | $21.92 | $1,575,215.04 |
| | **Total Shares** | **201,862** | **Total Proceeds** | **$4,407,915.04** |
| | | | | |
| **HUGHES** | 7/13/2020 | 11,451 | $17.16 | $196,499.16 |
| | 7/13/2020 | 40,516 | $16.56 | $670,944.96 |
| | 7/13/2020 | 10,546 | $15.67 | $165,255.82 |
| | 9/17/2020 | 50,000 | $25.78 | $1,289,000.00 |
| | 10/16/2020 | 50,000 | $23.00 | $1,150,000.00 |
| | 12/15/2020 | 55,989 | $21.61 | $1,209,922.29 |
| | 1/4/2021 | 25,000 | $20.73 | $518,250.00 |
| | 1/7/2021 | 100,000 | $25.00 | $2,500,000.00 |
| | 1/26/2021 | 100,000 | $28.00 | $2,800,000.00 |
| | 1/26/2021 | 100,000 | $30.00 | $3,000,000.00 |
| | 2/1/2021 | 25,000 | $35.97 | $899,250.00 |
| | **Total Shares** | **568,502** | **Total Proceeds** | **$14,399,122.23** |
| **MADER** | 11/24/2020 | 8,000 | $30.00 | $240,000.00 |
| | **Total Shares** | **8,000** | **Total Proceeds** | **$240,000.00** |
| | | | | |
| **SAMUELS** | 8/18/2020 | 300,000 | $16.54 | $4,962,000.00 |
| | 8/18/2020 | 100,000 | $16.62 | $1,662,000.00 |
| | 8/18/2020 | 100,000 | $16.80 | $1,680,000 |
| | 11/20/2020 | 33,333 | $25.00 | $833,448.33 |
| | 11/20/2020 | 33,333 | $25.03 | $834,181.66 |
| | 11/20/2020 | 33,333 | $25.00 | $833,391.67 |
| | 1/4/2021 | 33,333 | $20.73 | $690,993.09 |
| | 1/4/2021 | 33,333 | $20.73 | $690,993.09 |
| | 1/4/2021 | 33,333 | $20.73 | $690,993.09 |
| | 1/7/2021 | 33,333 | $26.00 | $866,658.00 |
| | 1/7/2021 | 33,333 | $26.00 | $866,658.00 |
| | 1/7/2021 | 33,333 | $26.00 | $866,658.00 |

|  | 1/26/2021 | 33,333 | $28.00 | $933,324.00 |
|---|---|---|---|---|
|  | 1/26/2021 | 33,333 | $30.00 | $999,990.00 |
|  | 1/26/2021 | 33,333 | $32.00 | $1,066,656.00 |
|  | 1/26/2021 | 33,333 | $28.00 | $933,324.00 |
|  | 1/26/2021 | 33,333 | $30.00 | $999,990.00 |
|  | 1/26/2021 | 33,333 | $32.00 | $1,066,656.00 |
|  | 1/26/2021 | 33,333 | $28.00 | $933,324.00 |
|  | 1/26/2021 | 33,333 | $30.00 | $999,990.00 |
|  | 1/26/2021 | 33,333 | $32.00 | $1,066,656.00 |
|  | **Total Shares** | **1,099,994** | **Total Proceeds** | **$24,477,884.93** |
|  |  |  |  |  |
| **SCHRADER** | 12/14/2020 | 15,152 | $21.92 | $332,131.84 |
|  | **Total Shares** | **15,152** | **Total Proceeds** | **$332,131.84** |
|  |  |  |  |  |
| **WILLISON** | 7/15/2020 | 19,920 | $16.34 | $325,492.80 |
|  | 1/26/2021 | 150,000 | $30.00 | $4,500,000.00 |
|  | **Total Shares** | **169,920** | **Total Proceeds** | **$4,825,492.80** |
|  |  |  |  |  |
|  |  |  |  |  |
|  | **Total Shares** | **2,608,894** | **Total Proceeds** | **$60,597,250.37** |

## DAMAGES TO WORKHORSE

63.   As a result of the Individual Defendants' improprieties, Workhorse disseminated improper, public statements. These improper statements have devastated Workhorse's credibility as reflected by the Company's over $3.2 billion, or 63%, market capitalization loss.

64.   Workhorse's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Workhorse's current and potential customers consider a company's ability to accurately value the costs to switching to an all-electric fleet of vehicles. Businesses are less likely to award contracts to companies that do not accurately disclose the costs of their products. Workhorse's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by

the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

65.     Further, as a direct and proximate result of the Individual Defendants' actions, Workhorse has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

> (a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and
>
> (b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Workhorse.

66.     In addition, the Company is entitled to recoup the benefit the Insider Selling Defendants reaped by using Workhorse's nonpublic information to their own advantage.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Demand would have been futile in this action at the time this suit was filed because a majority of the members of a board now sitting could not exercise independent and disinterested business judgment in responding to a demand.  The Board at the time of filing of this suit consisted of eight directors (the "Demand Board"), six of whom profited from the sale of Workhorse stock while in possession of material adverse nonpublic information and were under a duty to abstain from trading.

68.     The Company's Demand Board eight members were defendants Chess, DeMott, Samuels, Budde, Hughes, Clark, Dedo, and Mader.

69.     Demand is further excused because a majority of the Demand Board are Defendants who at the time of the filing of this lawsuit faced substantial likelihood of liability for the claims herein.

70.    A majority of the Demand Board are Director Defendants who faced substantial liability for insider trading.  The Director Defendants herein have only limited defenses to liability. Accordingly, these directors would not authorize this suit because it could uncover facts exposing all director Defendants to insider trading and thus expose these defendants to potentially ruinous personal liability with no indemnification.  Such liability, constituting a violations of law is not immunized by any exculpation provisions of the Company by-laws and/or charters.  Nor can directors be exculpate for violations of law.  Officers, of course, are not extended any protection under director exculpation laws.

71.    Thus, the Demand Board was unable to disinterestedly and independently investigate the Claims asserted herein.

72.    In light of the foregoing facts, a majority of the Demand Board faces a substantial likelihood of liability in this case, thus rendering demand on them futile.

73.    Director Defendants who constituted a majority of the Demand Board who signed and issued the materially false and misleading statements face a substantial likelihood of liability in this and the stockholders' class action.

74.    The Demand Board's inaction in the face of these numerous red flags, of which they knew or should have known, was a breach of their duties of loyalty.

75.    A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Board should face potential personal liability.  Allowing the Company to violate laws and federal regulations, or looking the other way while refusing to prevent others under the Board's control from committing these wrongful acts (and profiting from them), are all forms of misconduct that cannot under any circumstances by examples of legitimate

business conduct.  The protections of the "business judgment rule" do not extend to such insider trading.  Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

76.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.    The Individual Defendants owed and owe Workhorse fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Workhorse the highest obligation of loyalty and care.

78.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

79.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Workhorse has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

80.    Plaintiff, on behalf of Workhorse, has no adequate remedy at law.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

81.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Workhorse. The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Workhorse.

83.     Further, the Insider Selling Defendants sold Workhorse stock while in possession of material, nonpublic information that artificially inflated the price of Workhorse stock. As a result, the insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

84.     Plaintiff, as a stockholder and representative of Workhorse, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

85.     Plaintiff, on behalf of Workhorse, has no adequate remedy at law.

## COUNT III

### AGAINST DEFENDANT DUANE HUGHES AND STEVE SCHRADER FOR CONTRIBUTION UNDER 15 U.S.C. § 77 K(F) AND 21D(5)(A)-(D) AND 8 FOR VIOLATIONS OF SECTIONS 10(B) AND 21D OF THE EXCHANGE ACT

86.     Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

87.     Plaintiff asserts this Count against Duane Hughes and Steve Schrader (the "Contribution Defendants") who are named as defendants in related securities class actions. The conduct of these Contribution Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

88.     The Company is named as a Defendant in related securities class actions that allege acts and conduct which constitute violations of Section 10b5 of the Securities Exchanger Act and Section 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. These suits have caused the

Company to incur substantial costs for defense and settlement.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from the Contribution Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

89.     As officers, directors, and otherwise, the Contribution Defendants had the power to ability to, and did, control over influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and has the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

90.     The Contribution Defendants are liable under Section 11K(f) of the Securities Act and/or section 21D of the Exchange Act, which provides for claims of contributions from the same of Individual Defendants named herein.

91.     The Contribution Defendants have damaged the Company and are liable to the Company           for           contribution           and/or           indemnification. No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**COUNT IV**

**AGAINST THE OFFICER DEFENDANTS TO RESCIND
THEIR EMPLOYMENT CONTRACT COMPENSATION
<u>UNDER SECTION 29(B) OF THE EXCHANGE ACT</u>**

92.     Plaintiff incorporates by reference and reallege each and every preceding allegation set forth above, as though fully set forth herein.

93.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

94.    The principle that corporate contracts can be avoided under the securities laws is well-established, as recognized by the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party."

95.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

96.    The Officer Defendants violated the federal securities laws while performing their duties under various agreements they had with The Company for director services, and the Company is entitled to rescission of those agreements.

97.    The Company was and is an innocent party with respect to the Individual Defendants Exchange Act violations.

98.    Plaintiff, on behalf of the Company, seek rescission of the contracts between the Officer Defendants and the Company due to these defendants' violations of the Exchange Act while performing their job duties.

99.    As a result of the foregoing, the Company is entitled to recission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT V

### AGAINST THE DIRECTOR DEFENDANTS TO RESCIND THEIR COMPENSATION UNDER SECTION 29(B) OF THE EXCHANGE ACT

100.    Plaintiff incorporates by reference and reallege each and every preceding allegation set forth above, as though fully set forth herein.

101.    Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

102.    The principle that corporate contracts can be avoided under the securities laws is well-established, as recognized by the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted), "This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party."

103.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

104.    The Director Defendants violated the securities laws while performing their duties under various agreements they had with the Company for director services, and the Company is entitled to rescission of those agreements.

105.    The Company was and is an innocent party with respect to Director Defendants' Exchange Act violations.

31

106.    Plaintiff, on behalf of the Company, seek rescission of the contracts between the Director Defendants and the Company due to these defendants' violations of the Exchange Act while performing their job duties.

107.    As a result of the foregoing, the Company is entitled to rescission of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

## COUNT VI

### AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT 101

108.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

109.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

110.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

111.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

112.    Under the direction and watch of the Director Defendants, the Company's Proxy Statement filed with the SEC August 10, 2020 (the "Proxy Statement") failed to disclose, inter alia, the misrepresentations and omissions regarding the foregoing material facts which were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statement to  hold office until the next annual meeting of stockholders and until their successors are duly elected and qualified, including the election of the eight director nominees named in the Proxy Statement, the approval, for the purposes of NASDAQ Listing Rule 5635(D), of the issuance of the maximum number of shares of our Common Stock in connection with the Purchase Agreement (as defined herein) between the Company and HT Investment MA LLC, dated June 30, 2020, and ratification of the appointment of Grant Thornton LLP as the Company's independent auditors for the fiscal year ending December 31, 2020, thus rendering the Proxy Statements false and misleading.

113.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

114.    Plaintiff on behalf of Workhorse has no adequate remedy at law.

**<u>RELIEF REQUESTED</u>**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law and demand is excused;

B.      Awarding, against all Director and Officer Defendants and in favor of the Company, the return of contractual benefits to the Company;

C.      Awarding to the Company as rescissory damages under Section 29(b) of the Exchange Act for damages arising out of their contracts subject to Section 29(b) as alleged herein and voiding such contracts and eliminating any continuing liability of the Company to any parties thereto;

D.      Disgorgement of insider trading profits from the Insider Selling Defendants, and from their affiliates, and ordering disgorgement of all profits, benefits and other compensation obtained by their insider trading and further profits flowing therefrom;

E.      Awarding the Company judgment against the Individual Defendants and/or Insider Selling Defendants on the contribution claims asserted herein;

F.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

        i.      a provision to control insider selling;

        ii.      a provision to require the disclosure of when 10b5-1 trading plans are entered into or amended ;

        iii.      a proposal to strengthen Workhorse's oversight of its disclosure procedures;

        iv.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

        v.    a provision to permit the stockholders of Workhorse to nominate at least three candidates for election to the Board;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May ___, 2021

*Liaison Counsel for Plaintiff*

**THE LAW OFFICES OF HANI S. BUSHRA**
Mario Iskander
16541 Gothard Street # 208
Huntington Beach, California 92647
(714) 984-2000

**SQUITIERI & FEARON, LLP**
Lee Squitieri
32 East 57th Street, 12th Floor
New York, New York 10022
(212) 421-6492

**MOORE KUEHN, LLP**
Fletcher Moore
Justin Kuehn
30 Wall Street, 8th Floor
NY, NY 10005
(212) 709-8245
*Lead Counsel for Plaintiff*

**<u>AFFIRMATION</u>**

The undersigned hereby affirms that the preceding document filed in the above-referenced matter

does not contain the social security number of any person.